## EX PARTE REPUBLIC OF PERU.

No. 13, original. Argued March 1, 1943.—Decided April 5, 1943.

*Mr. Edgar R. Kraetzer,* with whom *Mr. Monte M. Lemann* was on the brief, for petitioner.

*Mr. Joseph M. Rault,* with whom *Messrs. George H. Terriberry* and *Walter Carroll* were on the brief, for Galban Lobo Co., S. A., et al., respondents.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

This is a motion for leave to file in this Court the petition of the Republic of Peru for a writ of prohibition or of mandamus. The petition asks this Court to prohibit respondent, a judge of the District Court for the Eastern District of Louisiana, and the other judges and officers of that court, from further exercise of jurisdiction over a proceeding *in rem,* pending in that court against petitioner's steamship *Ucayali,* and to direct the district judge to enter an order in the proceeding declaring the vessel immune from suit. The questions for decision here are whether this Court has jurisdiction to issue the writ, whether such jurisdiction should in our discretion be exercised in petitioner's behalf, and whether petitioner's appearance and defense of the suit in the district court was, as that court has ruled, a waiver of its claim that the vessel, being that of a friendly sovereign state, is im-

mune from suit brought by a private party in the court of the United States.

On March 30, 1942, Galban Lobo Co., S. A., a Cuban corporation, filed a libel in the district court against the *Ucayali* for its failure to carry a cargo of sugar from a Peruvian port to New York, as required by the terms of a charter party entered into by libelant with a Peruvian corporation acting as agent in behalf of the Peruvian Government. On April 9, 1942, the Republic of Peru, acting by the master of the vessel, intervened in the district court by filing a claim to the vessel, averring that the Republic of Peru was sole owner, and stating: "The filing of this claim is not a general appearance and is without prejudice to or waiver of all defenses and objections which may be available to respondent and claimant, particularly, but not exclusively, sovereign immunity."

On the same day, petitioner procured the release of the vessel by filing a surety release bond in the sum of $60,000, on which petitioner was principal. The bond, which contained a reservation identical with that appearing in petitioner's claim to the vessel, was conditioned upon payment of any amount awarded to libelant by the final decree in the cause. On April 11th petitioner proceeded in the cause to take the testimony of the master on the merits, and spread on the record a statement that the testimony was taken with like "full reservation and without waiver of all defenses and objections which may be available to respondent and claimant, particularly, but not exclusively, sovereign immunity." Petitioner also stated that "the appearance of counsel for the Government of Peru and the Steamship *Ucayali* is for the special purpose only of taking the testimony of the master under the reservation aforesaid."

On April 18th, and again on May 10th and on May 29th, petitioner moved for and obtained an order of the district court extending its time within which to answer

or otherwise plead to the libel. Each motion was made "with full reservation and without waiver of any defenses and objections which may be available to mover, particularly, but not exclusively, sovereign immunity."

In the meantime, petitioner, following the accepted course of procedure (see *Ex parte Muir*, 254 U. S. 522; *Compania Espanola* v. *The Navemar*, 303 U. S. 68), by appropriate representations, sought recognition by the State Department of petitioner's claim of immunity, and asked that the Department advise the Attorney General of the claim of immunity and that the Attorney General instruct the United States Attorney for the Eastern District of Louisiana to file in the district court the appropriate suggestion of immunity of the vessel from suit. These negotiations resulted in formal recognition by the State Department of the claim of immunity. This was communicated to the Attorney General by the Under Secretary's letter of May 5, 1942. The letter requested him to instruct the United States Attorney to present to the district court a copy of the Ambassador's formal claim of immunity filed with the State Department, and to say that "this Department accepts as true the statements of the Ambassador concerning the steamship *Ucayali*, and recognizes and allows the claim of immunity."

Pursuant to these instructions the United States Attorney, on June 29th, filed in the district court a formal statement advising the court of the proceedings and communications mentioned, suggesting to the court and praying "that the claim of immunity made on behalf of the said Peruvian Steamship *Ucayali* and recognized and allowed by the State Department be given full force and effect by this court"; and "that the said vessel proceeded against herein be declared immune from the jurisdiction and process of this court." On July 1st, petitioner moved for release of the vessel and that the suit be dismissed. The district court denied the motion on the ground that peti-

tioner had waived its immunity by applying for extensions of time within which to answer, and by taking the deposition of the master—steps which the district court thought constituted a general appearance despite petitioner's attempted reservation of its right to assert its immunity as a defense in the suit. 47 F. Supp. 203.

The first question for our consideration is that of our jurisdiction. Section 13 of the Judiciary Act of 1789, 1 Stat. 81, conferred upon this Court "power to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction, and writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office, under the authority of the United States." And § 14 provided that this Court and other federal courts "shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." 1 Stat. 81. These provisions have in substance been carried over into §§ 234 and 262 of the Judicial Code (28 U. S. C. §§ 342, 377), and § 751 of the Revised Statutes (28 U. S. C. § 451).

The jurisdiction of this Court as defined in Article III, § 2, of the Constitution is either "original" or "appellate." Suits brought in the district courts of the United States, not of such character as to be within the original jurisdiction of this Court under the Constitution, are cognizable by it only in the exercise of its appellate jurisdiction. Hence, its statutory authority to issue writs of prohibition or mandamus to district courts can be constitutionally exercised only insofar as such writs are in aid of its appellate jurisdiction. *Marbury* v. *Madison,* 1 Cranch 137, 173–80; *Ex parte Siebold,* 100 U. S. 371, 374–75.

Under the statutory provisions, the jurisdiction of this Court to issue common-law writs in aid of its appellate

jurisdiction has been consistently sustained. The historic use of writs of prohibition and mandamus directed by an appellate to an inferior court has been to exert the revisory appellate power over the inferior court. The writs thus afford an expeditious and effective means of confining the inferior court to a lawful exercise of its prescribed jurisdiction, or of compelling it to exercise its authority when it is its duty to do so. Such has been the office of the writs when directed by this Court to district courts, both before the Judiciary Act of 1925, 43 Stat. 936,[1] and since.[2] In all these cases (cited in notes 1 and 2), the appellate, not the original, jurisdiction of this Court was invoked and exercised.[3]

---

[1] E. g., *Ex parte State of New York, No. 1,* 256 U. S. 490; *The Western Maid,* 257 U. S. 419; *Ex parte Simons,* 247 U. S. 231; *Ex parte Peterson,* 253 U. S. 300, 305; *Ex parte Hudgings,* 249 U. S. 378; *Ex parte Uppercu,* 239 U. S. 435; *Matter of Heff,* 197 U. S. 488; *Ex parte Siebold,* 100 U. S. 371; *Ex parte Watkins,* 3 Pet. 193; *United States* v. *Peters,* 3 Dall. 121.

[2] *Ex parte United States,* 287 U. S. 241; *Maryland* v. *Soper (No. 1),* 270 U. S. 9, 27–28; *Maryland* v. *Soper (No. 2),* 270 U. S. 36; *Maryland* v. *Soper (No. 3),* 270 U. S. 44; *Colorado* v. *Symes,* 286 U. S. 510; *McCullough* v. *Cosgrave,* 309 U. S. 634; *Ex parte Kawato,* 317 U. S. 69; see *Los Angeles Brush Corp.* v. *James,* 272 U. S. 701.

[3] See particularly the discussion in *Maryland* v. *Soper (No. 1),* 270 U. S. 9, 28–30, and in *Ex parte United States,* 287 U. S. 241. Compare *Ex parte Siebold,* 100 U. S. 371.

*Ex parte United States, supra,* was not and could not have been a case of original jurisdiction. The Constitution confers original jurisdiction only in cases affecting ambassadors, other public ministers and consuls, and "those in which a State shall be Party" (Art. III, § 2, cl. 2). No state was made a party to *Ex parte United States.* The United States has never been held to be a "State" within this provision—and it obviously is not—nor has it any standing to bring an original action in this Court which does not otherwise come within one of the provisions of Article III, § 2, cl. 2. *United States* v. *Texas,* 143 U. S. 621, relied upon to sustain a different view, was within the original jurisdiction because the State of Texas was the party defendant. And

The common law writs, like equitable remedies, may be granted or withheld in the sound discretion of the Court, *Ex parte Skinner & Eddy Corp.*, 265 U. S. 86, 95–96; *Ex parte City of Monterey*, 269 U. S. 527; *Maryland* v. *Soper (No. 1)*, 270 U. S. 9, 29; *United States* v. *Dern*, 289 U. S. 352, 359, and are usually denied where other adequate remedy is available. *Ex parte Baldwin*, 291 U. S. 610. And ever since the statute vested in the circuit courts of appeals appellate jurisdiction on direct appeal from the district courts, this Court, in the exercise of its discretion, has in appropriate circumstances declined to issue the writ to a district court, but without prejudice to an application to the circuit court of appeals (*Ex parte Apex Mfg. Co.*, 274 U. S. 725; *Ex parte Daugherty*, 282 U. S. 809; *Ex parte Krentler-Arnold Hinge Last Co.*, 286 U. S. 533), which likewise has power under § 262 of the Judicial Code to issue the writ. *McClellan* v. *Carland*, 217 U. S. 268; *Adams* v. *U. S. ex rel. McCann*, 317 U. S. 269.

After a full review of the traditional use of the common-law writs by this Court, and in issuing a writ of mandamus, in aid of its appellate jurisdiction, to compel a district judge to issue a bench warrant in conformity to statutory requirements, this Court declared in *Ex parte United States*, 287 U. S. 241, 248–49: "The rule deducible from the later decisions, and which we now affirm, is, that this Court has full power in its discretion to issue the writ of mandamus to a federal district court, although the case be one in respect of which direct appellate jurisdiction is

until now it has never been suggested that necessity, however great, warrants the exercise by this Court of original jurisdiction which the Constitution has not conferred upon it. Moreover, even if Congress had withdrawn this Court's appellate jurisdiction by the 1925 Act, there would have been no necessity in *Ex parte United States* for inventing an original jurisdiction which the Constitution had withheld, since a writ of mandamus could have been applied for in the circuit court of appeals.

vested in the circuit court of appeals—this Court having ultimate discretionary jurisdiction by certiorari—but that such power will be exercised only where a question of public importance is involved, or where the question is of such a nature that it is peculiarly appropriate that such action by this Court should be taken. In other words, application for the writ ordinarily must be made to the intermediate appellate court, and made to this Court as the court of ultimate review only in such exceptional cases." [4]

[4] The suggestion that the Judiciary Act of 1925 was intended to curtail the jurisdiction previously exercised by this Court in granting such writs to the district courts finds no support in the history or language of the Act. The Act was originally prepared by a committee of justices of this Court, by whom it was submitted to Congress for consideration. Four members of this Court gave testimony before Congressional committees in explanation of the purposes and meaning of the Act, and Chief Justice Taft submitted a detailed statement of the changes which the Act would effect. These disclose that the great purpose of the Act was to curtail the Court's obligatory jurisdiction by substituting, for the appeal as of right, discretionary review by certiorari in many classes of cases. In all the oral and written submissions by members of this Court, and in the reports of the committees of Congress which recommended adoption of the bill, there is not a single suggestion that the Act would withdraw or limit the Court's existing jurisdiction to direct the common-law writs to the district courts when, in the exercise of its discretion, it deemed such a remedy appropriate. See Résumé, together with Citations Affecting Sections of Senate Bill 3164, submitted by Chief Justice Taft, printed for use of Senate Committee on the Judiciary, 67th Cong., 2d Sess.; Hearing on S. 2060 and S. 2061, before a Subcommittee of the Senate Committee on the Judiciary, Feb. 2, 1924, 68th Cong., 1st Sess.; Hearing on H. R. 8206 before House Committee on the Judiciary, Dec. 18, 1924, 68th Cong., 2d Sess.; S. Rep. No. 362, 68th Cong., 1st Sess.; H. Rep. No. 1075, 68th Cong., 2d Sess. The changes in existing law proposed to be made by the Act were set forth with painstaking detail. It is hardly conceivable that the justices of this Court, fully familiar with its practice, would have left unexpressed an intention—had such intention really existed—to curtail drastically a jurisdiction which the Court had exercised under statutory

We conclude that we have jurisdiction to issue the writ as prayed. And we think that—unless the sovereign immunity has been waived—the case is one of such public importance and exceptional character as to call for the exercise of our discretion to issue the writ rather than to relegate the Republic of Peru to the circuit court of appeals, from which it might be necessary to bring the case to this Court again by certiorari. The case involves the

authority from the beginning of its history. *Ex parte United States*, and most of the other cases cited in note 2, *supra*, were decided at a time when members of the Court's committee responsible for the 1925 Act were still members of the Court. The Court's unanimous concurrence in the existence of its jurisdiction in the cases subsequent to the 1925 Act establishes a practice (cf. *Stuart* v. *Laird*, 1 Cranch 299, 309) which would be beyond explanation if there had been any thought that any provision of the Act had placed such a restriction on the Court's jurisdiction to issue the writs.

Nor can it be said that this legislative history gives any support to the suggestion that the failure of the 1925 Act to cut off the jurisdiction of this Court to issue the common-law writs to district courts was inadvertent, and that the Act should therefore be construed as though it had done what it failed to do. The jurisdiction of this Court to issue such writs, like its jurisdiction to grant certiorari, is discretionary. The definite aim of the 1925 Act was to enlarge, not to destroy, the Court's discretionary jurisdiction. That aim can hardly give rise to an inference of an unexpressed purpose to amend or repeal the statutes of the United States conferring jurisdiction on the Court to issue the writs, or an inference that such would have been the purpose had repeal been proposed. The exercise of that jurisdiction has placed no undue burden on this Court. It is significant that, since 1925, less than ten of the numerous applications to this Court for such writs have been granted. Only in rare instances has their denial been the occasion for an opinion dealing with questions of public importance. See, e. g., *Los Angeles Brush Corp.* v. *James*, 272 U. S. 701; *Ex parte Baldwin*, 291 U. S. 610; *Ex parte Colonna*, 314 U. S. 510; cf. *Mooney* v. *Holohan*, 294 U. S. 103. And whatever the scope of the jurisdiction of this Court, in no case does it decline to examine an application in order to determine whether it has jurisdiction.

dignity and rights of a friendly sovereign state, claims against which are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State. When the Secretary elects, as he may and as he appears to have done in this case, to settle claims against the vessel by diplomatic negotiations between the two countries rather than by continued litigation in the courts, it is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court. If the Republic of Peru has not waived its immunity, we think that there are persuasive grounds for exercising our jurisdiction to issue the writ in this case and at this time without requiring petitioner to apply to the circuit court of appeals, and that those grounds are at least as strong and urgent as those found sufficient in *Ex parte United States,* in *Maryland* v. *Soper,* in *Colorado* v. *Symes,* and in *McCullough* v. *Cosgrave,* all *supra,* note 2. We accordingly pass to the question whether petitioner has waived his immunity.

This case presents no question of the jurisdiction of the district court over the person of a defendant. Such jurisdiction must be acquired either by the service of process or by the defendant's appearance or participation in the litigation. Here the district court acquired jurisdiction *in rem* by the seizure and control of the vessel, and the libelant's claim against the vessel constituted a case or controversy which the court had authority to decide. Indeed, for the purpose of determining whether petitioner was entitled to the claimed immunity, the district court, in the absence of recognition of the immunity by the Department of State, had authority to decide for itself whether all the requisites for such immunity existed—

whether the vessel when seized was petitioner's, and was of a character entitling it to the immunity. See *Ex parte Muir, supra; The Pesaro,* 255 U. S. 216; *Berizzi Bros. Co.* v. *The Pesaro,* 271 U. S. 562; *Compania Espanola* v. *The Navemar, supra.* Therefore the question which we must decide is not whether there was jurisdiction in the district court, acquired by the appearance of petitioner, but whether the jurisdiction which the court had already acquired by seizure of the vessel should have been relinquished in conformity to an overriding principle of substantive law.

That principle is that courts may not so exercise their jurisdiction, by the seizure and detention of the property of a friendly sovereign, as to embarrass the executive arm of the Government in conducting foreign relations. "In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *United States* v. *Lee,* 106 U. S. 196, 209. More specifically, the judicial seizure of the vessel of a friendly foreign state is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination that the vessel is immune. When such a seizure occurs the friendly foreign sovereign may present its claim of immunity by appearance in the suit and by way of defense to the libel. *Compania Espanola* v. *The Navemar, supra,* 74 and cases cited; *Ex parte Muir, supra.* But it may also present its claim to the Department of State, the political arm of the Government charged with the conduct of our foreign affairs. Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations. *Compania Espanola* v. *The Navemar, supra,*

74; *The Exchange,* 7 Cranch 116. This practice is founded upon the policy, recognized both by the Department of State and the courts, that our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings.

We cannot say that the Republic of Peru has waived its immunity. It has consistently declared its reliance on the immunity, both before the Department and in the district court. Neither method of asserting the immunity is incompatible with the other. Nor, in view of the purpose to be achieved by permitting the immunity to be asserted, are we able to perceive any ground for saying that the district court should disregard the claim of immunity, which a friendly sovereign is authorized to advance by way of defense in the pending suit, merely because the sovereign has seen fit to preserve its right to interpose other defenses. The evil consequences which might follow the seizure of the vessel are not any the less because the friendly state asserts other grounds for the vessel's release.

Here the State Department has not left the Republic of Peru to intervene in the litigation through its Ambassador as in the case of *Compania Espanola* v. *The Navemar.* The Department has allowed the claim of immunity and caused its action to be certified to the district court through the appropriate channels. The certification and the request that the vessel be declared immune must be accepted by the courts as a conclusive determination by the political arm of the Government that the continued retention of the vessel interferes with the proper conduct of our foreign relations. Upon the submission of this certification to the district court, it became the court's duty, in conformity to established principles, to release the vessel and to proceed no further in the cause. We

have no occasion to decide whether the court should surrender the vessel and dismiss the suit on certification of sovereign immunity by the Secretary, made after the friendly sovereign has once unqualifiedly assented to a judicial determination of the controversy.

The motion for leave to file is granted. We assume that, in view of this opinion, formal issuance of the writ will be unnecessary, and we direct that the writ issue only on further application by the petitioner.

MR. JUSTICE ROBERTS concurs in the result.

MR. JUSTICE FRANKFURTER, dissenting:

If due regard be had for its aims, the Judiciary Act of 1925, 43 Stat. 936, denies us, in my opinion, the power to review the action in this case of the District Court for the Eastern District of Louisiana, even though such review is cast in form of a writ of prohibition or of mandamus. But, even assuming we have discretionary power to issue such writs to a district court, we should in the circumstances of this case abstain from exercising that power, in view of the absence of any showing that relief equally prompt and effective and consonant with the national interest was not, and is not, available in the appropriate Circuit Court of Appeals.

The range of cases that may be brought here directly from the district courts and the rigor with which we limit our discretionary jurisdiction determine the capacity of this Court adequately to discharge its essential functions. I shall therefore briefly state the grounds for believing that this case is improperly here, that the rule should be discharged, and the motion for leave to file the petition be denied. I put to one side the relation of the Peruvian Ambassador to this litigation. This is not a proceeding falling under the rubric "Cases affecting Ambassadors" and thereby giving us original jurisdiction. My brethren

do not so treat it, and our common starting point is that in taking hold of this case the Court is exercising its appellate jurisdiction.

We are also agreed that this Court "can exercise no appellate jurisdiction, except in the cases, and in the manner and form, defined and prescribed by Congress." *American Construction Co.* v. *Jacksonville, T. & K. W. Ry. Co.,* 148 U. S. 372, 378. Had this case arisen under the Evarts Act (Act of March 3, 1891, 26 Stat. 826), appeal could have been taken from the district court, since its jurisdiction was in issue, directly to this Court without going to the Circuit Court of Appeals. See, *e. g., Wilson* v. *Republic Iron Co.,* 257 U. S. 92. And since the case would have been within the immediate appellate jurisdiction of this Court, §§ 13 and 14 of the first Judiciary Act, 1 Stat. 73, 80–82 (now 28 U. S. C. §§ 342, 377, 451), would have authorized this Court to issue an appropriate writ to prevent frustration of its appellate power, see *Ex parte Crane,* 5 Pet. 190, or have enabled it to accelerate its own undoubted reviewing authority where, under very exceptional circumstances, actual and not undefined interests of justice so required. Compare *In re Chetwood,* 165 U. S. 443; *Whitney* v. *Dick,* 202 U. S. 132; *Adams* v. *U. S. ex rel. McCann,* 317 U. S. 269.

The power to issue these auxiliary writs is not a qualification or even a loose construction of the strict limits, defined by the Constitution and the Congress, within which this Court must move in reviewing decisions of lower courts. There have been occasional, but not many, deviations from the true doctrine in employing these auxiliary writs as incidental to the right granted by Congress to this Court to review litigation, in aid of which it may become necessary to issue a facilitating writ. The issuance of such a writ is, in effect, an anticipatory review of a case that can in due course come here directly. When the Act of 1891 established the intermediate courts of appeals and

gave to them a considerable part of the appellate jurisdiction formerly exercised by the Supreme Court, the philosophy and practice of federal appellate jurisdiction came under careful scrutiny. This Court uniformly and without dissent held that it was without power to issue a writ of mandamus in a case in which it did not otherwise have appellate jurisdiction. *In re Massachusetts,* 197 U. S. 482, and *In re Glaser,* 198 U. S. 171. In these cases, rules were discharged because, under the Circuit Courts of Appeals Act, appeals could not be brought directly to the Supreme Court but would have to go to the Circuit Court of Appeals, and only thereafter could they come here, if at all, through certiorari. But review could be brought directly to this Court of cases in which the jurisdiction of the district court was in issue, and therefore writs of "prohibition or mandamus or certiorari as ancillary thereto," *In re Massachusetts, supra,* at 488, were available. Cases which came here directly, prior to the Judiciary Act of February 13, 1925, 43 Stat. 936, to review the jurisdiction of the district courts, whether on appeal or through the informal procedure of auxiliary writs, are therefore not relevant precedents for the present case.

The Judiciary Act of 1925 was aimed to extend the Court's control over its business by curtailing its appellate jurisdiction drastically. Relief was given by Congress to enable this Court to discharge its indispensable functions of interpreting the Constitution and preserving uniformity of decision among the eleven intermediate courts of appeals. Periodically since the Civil War— to speak only of recent times—the prodigal scope of the appellate jurisdiction of this Court brought more cases here than even the most competent tribunal could wisely and promptly adjudicate. Arrears became inevitable until, after a long legislative travail, the establishment in 1891 of intermediate appellate tribunals freed this Court of a large volume of business. By 1916, Congress had

to erect a further dam against access to this Court of litigation that already had been through two lower courts and was not of a nature calling for the judgment of the Supreme Court.  Act of September 6, 1916, 39 Stat. 726. But the increase of business—the inevitable aftermath of the Great War and of renewed legislative activity—soon caught up with the meager relief afforded by the Act of 1916.  The old evils of an overburdened docket reappeared.  Absorption of the appellate jurisdiction of the Supreme Court by cases that should have gone to, or been left with, the circuit courts of appeals resulted in unjustifiable subordination of the national interests in the special keeping of this Court.  To be sure, the situation was not as bad as that which called the circuit courts of appeals into being.  In the eighties, three to four years elapsed between the docketing and the hearing of a case. But it was bad enough.  In 1922, Chief Justice Taft reported to Congress that it took from fifteen to eighteen months for a case to reach argument.

The needless clog on the Court's proper business came from two sources.  More than a dozen classes of cases could have a second review in the Supreme Court, as a matter of right, after an unsuccessful appeal in the circuit courts of appeals.  With a single exception, all adjudications by the circuit courts of appeals were by the Act of 1925 made reviewable only by the discretionary writ of certiorari.  But no less prolific a source of mischief in the practical application of the appellate jurisdiction of the Supreme Court prior to the Act of 1925, was the right to bring cases directly to this Court from the district courts.  According to the figures submitted to Congress in support of the need for the 1925 legislation, one-sixth of the total business of the Supreme Court came directly from the district courts.  (Hearing before a Subcommittee of the Committee on the Judiciary, United States Sen-

ate, 68th Cong., 1st Sess., on S. 2060 and S. 2061, pp. 32–33, 44–45.) Most of these cases presented phases of the general question now before us, namely, the right of a district court to adjudicate. The obvious remedy for this unwarranted direct review of courts of first instance was to shut off direct access from the district courts to this Court. That is exactly what was proposed. In the language of the chief spokesman before the judiciary Committees, "Section 238 as amended and reenacted in the bill would permit cases falling within four particular classes, and those only, to come from the district courts directly to the Supreme Court. . . . Apart from cases within these four classes, the bill provides that the immediate review of all decisions in the district courts shall be in the circuit courts of appeals. We regard this as the better course and calculated to promote the public interest." *Ibid.*, 33–34. This conception of "the public interest" was translated into law, except that in one additional class of cases direct review was allowed from the district courts to this Court. Suffice it to say that the five excepted categories are not in serious derogation of the wise requirement that review of action by the district courts belongs to the circuit courts of appeals. All five either involve litigation before a district court composed of three judges, or ordinarily touch matters of national concern.

The present power of this Court to review directly decisions of district courts must be determined by the restrictions Congress imposed in the Act of 1925. The language of that section is significant:

"A direct review by the Supreme Court of an interlocutory or final judgment or decree of a district court may be had where it is so provided in the following Acts or parts of Acts, *and not otherwise.* . . ." (43 Stat. 936, 938— italics provided.)

This case does not fall even remotely within any of these five Acts.[1] We have thus been given no appellate jurisdiction over this controversy, but by resort to so-called ancillary writs we are exercising appellate jurisdiction here. On principle, it is still as true as it was held to be in *In re Massachusetts, supra,* and *In re Glaser, supra,* that "in cases over which we possess neither original nor appellate jurisdiction we cannot grant prohibition or mandamus . . . as ancillary thereto." 197 U. S. 482, 488. This

---

[1] "SEC. 238. A direct review by the Supreme Court of an interlocutory or final judgment or decree of a district court may be had where it is so provided in the following Acts or parts of Acts, and not otherwise:

(1) Section 2 of the Act of February 11, 1903, 'to expedite the hearing and determination' of certain suits brought by the United States under the antitrust or interstate commerce laws, and so forth.

(2) The Act of March 2, 1907, 'providing for writs of error in certain instances in criminal cases' where the decision of the district court is adverse to the United States.

(3) An Act restricting the issuance of interlocutory injunctions to suspend the enforcement of the statute of a State or of an order made by an administrative board or commission created by and acting under the statute of a State, approved March 4, 1913, which Act is hereby amended by adding at the end thereof, 'The requirement respecting the presence of three judges shall also apply to the final hearing in such suit in the district court; and a direct appeal to the Supreme Court may be taken from a final decree granting or denying a permanent injunction in such suit.'

(4) So much of 'An Act making appropriations to supply urgent deficiencies in appropriations for the fiscal year 1913, and for other purposes,' approved October 22, 1913, as relates to the review of interlocutory and final judgments and decrees in suits to enforce, suspend, or set aside orders of the Interstate Commerce Commission other than for the payment of money.

(5) Section 316 of 'An Act to regulate interstate and foreign commerce in livestock, livestock products, dairy products, poultry, poultry products, and eggs, and for other purposes' approved August 15, 1921." 43 Stat. 936, 938.

does not imply that by indirection the Act of 1925 repealed what were originally §§ 13 and 14 of the Judiciary Act of 1789, on which, in their present form in the United States Code (28 U. S. C. §§ 342, 377, 451), the Court relies. The new distribution of appellate jurisdiction between the Supreme Court and the circuit courts of appeals did not repeal these old provisions. It does, however, call for restriction of their application in harmony with this new distribution. Ancillary writs are still available both for the circuit courts of appeals and this Court when they may in fact be ancillary to a main suit. See *Ex parte Kawato,* 316 U. S. 650, 317 U. S. 69, .71 (leave to file petition for writ of mandamus granted after such leave was denied by the Circuit Court of Appeals); and *Adams* v. *U. S. ex rel. McCann,* 317 U. S. 269. But when we cannot have jurisdiction in a case on appeal, no proceeding can be ancillary to it.

I am not unmindful that the hearings on the Judiciary Act of 1925 before the Committees of Congress are completely silent regarding the appellate jurisdiction of this Court through use of ancillary writs. But it would not be the first time in the history of judiciary legislation that eminent jurisdictional authorities and expert draftsmen, preoccupied with major problems in a large scheme for relieving this Court of undue business, have been forgetful of minor aspects of jurisdiction. For instance, it took six years to deal with the implications overlooked by Senator Evarts in using the phrase "infamous crimes" in the Act of 1891. (See *In re Claasen,* 140 U. S. 200, and H. Rep. No. 666, 54th Cong., 1st Sess., the letter of Chief Justice Fuller to Senator Hoar in 23 Cong. Rec. 3285–86, Report of Attorney General Olney for 1893, xxv, and the Act of January 20, 1897, 29 Stat. 492.) Legislation by even the most competent hands, like other forms of composition, is subject to the frailties of the imagination. Concentration on the basic aims of a reform like the Act

of 1925 inevitably overlooks lacunae and ambiguities which the future reveals and which the future must correct. The Act of 1925, despite its deft authorship, soon revealed such ambiguities. See the series of cases collected in *Phillips* v. *United States,* 312 U. S. 246, 250–51. They were resolved by faithful enforcement of the central purpose of the Act of February 13, 1925, which was "to keep within narrow confines our appellate docket," 312 U. S. at 250. For more than half a century the desire of Congress to cut down the appellate jurisdiction of this Court has been given effect in a variety of situations even though Congress did not adequately express such purpose. See, for instance, *McLish* v. *Roff,* 141 U. S. 661; *Robinson* v. *Caldwell,* 165 U. S. 359; *American Sugar Refining Co.* v. *New Orleans,* 181 U. S. 277; *American Security Co.* v. *District of Columbia,* 224 U. S. 491; *Inter-Island Steam Navigation Co.* v. *Ward,* 242 U. S. 1.

Finally, it is urged that practice since the Judiciary Act of 1925 sanctions the present assumption of jurisdiction. Cases like *Ex parte Northern Pacific Ry. Co.,* 280 U. S. 142, ordering a district judge to summon three judges to hear a suit under § 266 of the Judicial Code (28 U. S. C. § 380), must be put to one side. This is one of the excepted classes under the Act of 1925 in which direct review lies from a district court to the Supreme Court, and it is therefore an orthodox utilization of an ancillary writ, within the rule of *In re Massachusetts, supra.* Of all the other cases in which, since the Act of 1925, a writ was authorized to be issued, none is comparable to the circumstances of the present case. In one, *Ex parte Kawato, supra,* the appellate jurisdiction of this Court was invoked only after appellate jurisdiction was denied by a circuit court of appeals. Another, *Ex parte United States,* 287 U. S. 241, while in form a review of action by a district court, was in fact an independent suit by the United States, because no appeal as such lay from the refusal of

the district judge in that case to issue a bench warrant in denial of his duty. If the suit was a justiciable controversy through use of the ancillary writ, it was equally justiciable if regarded as an original suit by the United States. While, to be sure, it was not formally such, and while an ordinary suit by the United States to enforce an obligation against one of its citizens properly cannot be brought within the original jurisdiction of this Court, *Ex parte United States, supra,* was quite different. There the United States sought enforcement of a public duty for which no redress could be had in any other court. Therefore, the considerations which led this Court in *United States v. Texas,* 143 U. S. 621, to allow the United States to initiate an original suit in, this Court, although the merely literal language of the Constitution precluded it (as the dissent in that case insisted), might have been equally potent to allow assumption of such jurisdiction in the circumstances of *Ex parte United States.* But, in any event, merely because there is no other available judicial relief is no reason for taking appellate jurisdiction. For some situations the only appropriate remedy is corrective legislation. Of the same nature were four other cases, three suits by Maryland and one by Colorado. *Maryland v. Soper* (1), 270 U. S. 9; *Maryland v. Soper* (2), 270 U. S. 36; *Maryland v. Soper* (3), 270 U. S. 44; *Colorado v. Symes,* 286 U. S. 510. These cases were not ordinary claims by a state against one of its citizens for which the state courts are the appropriate tribunals, see *California v. Southern Pacific Co.,* 157 U. S. 229. They were in effect suits by states against federal functionaries in situations in which the citizenship of these functionaries was irrelevant to the controversy. And so the considerations that made the controversies by Maryland and Colorado justiciable through ancillary writs might have been equally relevant in establishing justiciability for original suits in this Court under Article III, § 2. It is not without sig-

nificance that the *Maryland* v. *Soper* cases and *Colorado* v. *Symes,* which the Court now regards as precedents for the ruling in *Ex parte United States,* were not even referred to in the opinion in the latter case.

If *Ex parte United States,* the *Maryland* v. *Soper* cases, and *Colorado* v. *Symes, supra,* are not to be supported on the basis of their peculiar circumstances which might have justified the Court in assuming jurisdiction, they should be candidly regarded as deviations from the narrow limits within which our appellate jurisdiction should move. They would then belong with the occasional lapses which occur when technical questions of jurisdiction are not properly presented to the Court and consciously met. That leaves two other cases, *Los Angeles Brush Corp.* v. *James,* 272 U. S. 701, and *McCullough* v. *Cosgrave,* 309 U. S. 634. In the *Los Angeles Brush* case, the Court explicitly refused to invoke authority to issue an ancilliary writ inasmuch as the appellate jurisdiction of the controversy belonged to the Circuit Court of Appeals and not to this Court. The case concerned "the enforcement of the Equity Rules," 272 U. S. at 706, and the power which this Court recognized in that case was part of the duty imposed upon the Court by Congress to formulate and put in force the Equity Rules. The *McCullough* case was equally restricted. It merely followed the *Los Angeles Brush* case in enforcing the Equity Rules.

To be sure, *Ex parte United States, supra,* stated that later cases had qualified *In re Massachusetts* and *In re Glaser, supra.* But the cases that were avouched (*McClellan* v. *Carland,* 217 U. S. 268; *Ex parte Abdu,* 247 U. S. 27) in no wise called into question *In re Massachusetts* and *In re Glaser,* and the actual decisions left them intact. The authority of *In re Massachusetts, supra,* and *In re Glaser, supra,* was unquestioned as late as 1923, in *Magnum Co.* v. *Coty,* 262 U. S. 159, after, that is, the cases referred to in *Ex parte United States, supra,* as having

limited *In re Massachusetts* and *In re Glaser*. The essence of the Act of 1925 was curtailment of our appellate jurisdiction as a measure necessary for the effective discharge of the Court's functions. It is hardly consonant with this restrictive purpose of the Act of 1925 to enlarge the opportunities to come to this Court beyond the limit recognized and enforced under the Act of 1891—that there can be no ancillary jurisdiction where the litigation on the merits could not directly come here for review. In only one of the cases since the Act of 1925 in which the ancillary writs were invoked in situations in which this Court did not have direct appellate jurisdiction, did counsel call to the attention of this Court the bearing of the Act of 1925 upon the power to issue ancillary writs and the relevance of cases prior to that Act, and in no case did this Court apparently address itself to the problem now canvassed. Authority exercised *sub silentio* does not establish jurisdiction. Throughout its history it has been the firm policy of this Court not to recognize the exercise of jurisdiction under such circumstances as precedents when the question is first sharply brought for decision. *United States* v. *More,* 3 Cranch 159, 172; *Snow* v. *United States,* 118 U. S. 346, 354–55; *Cross* v. *Burke,* 146 U. S. 82, 87; *Louisville Trust Co.* v. *Knott,* 191 U. S. 225, 236; *Arant* v. *Lane,* 245 U. S. 166, 170.

In deciding whether to give a latitudinarian or a restricted scope to the appellate jurisdiction of this Court, the important factor is the number of instances in which applications for the exercise of the Court's jurisdiction has been or may be made, not the number of instances in which the jurisdiction has been exercised. And so it tells little that less than ten applications for mandamus have been granted since the Act of 1925. What is far more important is that merely for the first seven Terms after that Act not less than seventy-two applications for such writs were made. Every application consumes time in consideration, whether eventually granted or denied.

Had the Court jurisdiction, this case would furnish no occasion for its exercise. On whatever technical basis of jurisdiction the availability of these writs may have been founded, their use has been reserved for very special circumstances. However varying the language of justification, these ancillary writs have been issued only to further some imperative claim of justice. In the present case, the upshot of these proceedings is to circumvent the intermediate appellate court as the natural and normal resort for relief from a claim of want of jurisdiction in the district court.

No palpable exigency either of national or international import is made manifest for seeking this extraordinary relief here. For all practical purposes, the litigation has ceased to concern a vessel belonging to a sister republic. While, to be sure, the legal issues turn on the claim of sovereign immunity by Peru in a vessel libeled in an American harbor, the ship has long since been released and the actual stake of the controversy is a bond. Thus the case for our intervention, to the disregard of the Circuit Court of Appeals, cannot be put higher than the propriety of vindicating the dignity of a friendly foreign state.

But surely this is to introduce the formal elegancies of diplomacy into the severe business of securing legal rights through the judicial machinery normally adapted for the purpose. After all, if the framers of the Constitution had deemed litigation in this Court alone to comport with appropriate regard for the dignity of a friendly foreign state, they would have given this Court original jurisdiction in such cases. If our nearest neighbors wished to litigate in this country, they could not bring suit in this Court. See *Monaco* v. *Mississippi,* 292 U. S. 313. It is not deemed incompatible with the dignity of the United States itself to begin suit in a district court, have the litigation proceed to the circuit court of appeals, and only

by our leave reach this Court. See, *e. g., United States* v. *California*, 297 U. S. 175. Litigation involving the interests of the United States in ships owned by it has twice recently gone through this normal process, and it will not be thought that the dignity of the United States was thereby compromised. Indeed, under the arrangements made by Congress in 1925, measures deemed indispensable for the conduct of the war could be nullified by district courts and could not come here for review until appeal was duly taken to the circuit courts of appeals. To be sure, Congress has wisely provided that once such an appeal is filed this Court in its discretion may bring the appeal here. See, *e. g., White* v. *Mechanics Securities Corp.*, 269 U. S. 283; *Norman* v. *B. & O. R. Co.*, 294 U. S. 240, 294–95; *Ex parte Quirin*, 317 U. S. 1, 19–20. To require a foreign state to seek relief in an orderly fashion through the circuit court of appeals can imply an indifference to the dignity of a sister nation only on the assumption that circuit courts of appeals are not courts of great authority. Our federal judicial system presupposes the contrary. Certainly this Court should in every possible way attribute to these courts a prestige which invites reliance for the burdens of appellate review except in those cases, relatively few, in which this Court is called upon to adjudicate constitutional issues or other questions of national importance.

To remit a controversy like this to the circuit court of appeals where it properly belongs is not to be indifferent to claims of importance but to be uncompromising in safeguarding the conditions which alone will enable this Court to discharge well the duties entrusted exclusively to us. The tremendous and delicate problems which call for the judgment of the nation's ultimate tribunal require the utmost conservation of time and energy even for the ablest judges. Listening to arguments and studying records and briefs constitute only a fraction of what goes into the

judicial process. For one thing, as the present law reports compared with those of even a generation ago bear ample testimony, the types of cases that now come before the Court to a considerable extent require study of materials outside the technical law books. But more important, the judgments of this Court are collective judgments. Such judgments presuppose ample time and freshness of mind for private study and reflection in preparation for discussions in Conference. Without adequate study there cannot be adequate reflection; without adequate reflection there cannot be adequate discussion; without adequate discussion there cannot be that mature and fruitful interchange of minds which is indispensable to wise decisions and luminous opinions.

It is therefore imperative that the docket of the Court be kept down, that no case be taken which does not rise to the significance of inescapability for the responsibility entrusted to this Court. Every case that is allowed to come here which, judged by these standards, may well be left either to the state courts or to the circuit courts of appeals, makes inroads upon thought and energy which properly belong to the limited number of cases which only this Court can adjudicate. Even a judge of such unique gifts and experience as Mr. Justice Holmes felt at the very height of his powers, as we now know, the whip of undue pressure in his work. One case is not just one case more, and does not stop with being just one more case. Chief Justice Taft was not the last judge who, as he said of himself, "having a kind heart, I am inclined to grant probably more [discretionary reviews] than is wise." (Hearing before the Committee on the Judiciary, House of Representatives, 68th Cong., 2d Sess., on H. R. 8206, p. 27.)

In a case like this, we should deny our power to exercise jurisdiction. But, in any event, we should refuse to exercise it. By such refusal we would discourage future

applications of a similar kind, and thereby enforce those rigorous standards in this Court's judicial administration which alone will give us the freshness and vigor of thought and spirit that are indispensable for wise decisions in the causes committed to us.

MR. JUSTICE REED is of the opinion that this Court has jurisdiction to grant the writ requested, *Ex parte United States,* 287 U. S. 241, but concurs in this dissent on the ground that application for the writ sought should have been made first to the Circuit Court of Appeals.