**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ST. LUKE'S HOSPITAL CENTER and District 1199, National Union of Hospital and Health Care Employees, a Division of RWDSU, AFL–CIO, Respondents.**

**No. 142, Docket 76–4088.**

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1976.

Decided Dec. 29, 1976.

Richard Dorn, New York City (Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, of counsel), for respondent Dist. 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO.

James S. Frank, New York City, submitted an affidavit for respondent St. Luke's Hospital Center.

Before KAUFMAN, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

"Nobody," Learned Hand has reminded us, "is so gifted with foresight that he can divine all possible human events in advance and prescribe the proper rule for each." [1] The judge who must interpret the often Delphic words chosen by Congress to effectuate its will can do no more than "try to find out what the government . . . would have done, if the case before him had been before [it]." [2]

In 1974 Congress extended the protection of the National Labor Relations Act to employees of nonprofit hospitals.[3] Before the new legislation took effect, St. Luke's Hospital Center and District 1199, National Union of Hospital and Health Care Employees, concluded a collective bargaining agreement with a standard union security clause. The bargaining unit, certified by the New York State Labor Relations Board, included professional dieticians, though no separate election had ever been held to determine whether a majority of dieticians desired inclusion. Such a unit could not have been certified by the National Labor Relations Board. See § 9(b)(1), 29 U.S.C. § 159(b)(1). We are asked to decide whether the hospital's attempted enforcement of the union security clause, at the union's behest, after the effective date of the Non-Profit Hospital Amendments, constituted unfair labor

1. L. Hand, The Spirit of Liberty 105 (1952).

2. *Id.* at 106.

3. Prior to 1974, § 2(2), 29 U.S.C. § 152(2), excluded "any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual" from the statutory definition of "employer". Public Law 93–360, 88 Stat. 395, eliminated this exemption.

practices under §§ 8(a)(3)[4] and 8(b)(2)[5] of the National Labor Relations Act. Because we believe that Congress, had it considered the problem, would have wished national policy to prevail under these circumstances, we agree with the NLRB that enforcement of the union security clause was an unfair labor practice.

## I.

A brief summary of the relevant facts will facilitate understanding of the legal issue before us. The roots of this controversy lie in District 1199's effort, beginning in the spring of 1973, to organize the employees of St. Luke's Hospital Center. On April 16 the union filed a petition with the New York State Labor Relations Board seeking an election in a unit of both professional and technical workers. Several professional groups, including the dieticians involved here, rebelled at the prospect of being represented by District 1199 and filed petitions seeking a separate election in their various professional units.[6]

On May 8, 1973, the interested parties—the hospital, District 1199, and the Professional Dietician Employees of St. Luke's Hospital Center—entered a consent agreement, subject to the approval of the State Board, providing the dieticians an opportunity to vote on whether there should be a separate bargaining unit limited to professional dieticians.[7] The State Board rejected

---

4. (a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

§ 8(a)(3), 29 U.S.C. § 158(a)(3).

5. (b) It shall be an unfair labor practice for a labor organization or its agents—

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

§ 8(b)(2), 29 U.S.C. § 158(b)(2).

6. Petitions were filed by the dieticians, pharmacists, physical therapists, dental hygienists, and electro-encephalographic technologists. Only the dieticians are involved in the dispute now before us.

7. The consent agreement provided that the ballot used in the election to be conducted among the dieticians would pose the following three questions:

1. Do you want a separate bargaining unit limited only to research dieticians, therapeutic dieticians and clinic dieticians?

2. If there is a separate unit of research dieticians, therapeutic dieticians and clinic dieticians do you then desire to be represented for the purposes of collective bargaining by Professional Dietician Employees of St. Luke's Hospital Center?

3. If there is to be a combined unit of research dieticians, therapeutic dieticians, clinic dieticians and technical and professional employees, do you then desire to be represented for the purposes of collective bargaining by Guild of Professional, Technical and Office Employees, Local 1199, Drug and Hospital Union, AFL–CIO?

Of course, by voting for a separate bargaining unit and against representation by the Profes-

this voluntary arrangement. Instead, it ordered an election in the broad unit initially proposed by District 1199. The employees in classifications for which separate petitions were pending and undetermined would be allowed to vote, but their ballots would be challenged and their inclusion in the bargaining unit delayed. If any of them were found to be professionals and subsequently voted for a separate bargaining unit, they would be excluded from the general unit of technical and professional employees.

District 1199 easily won election as the bargaining representative for the hospital's technical employees. Of the 284 ballots cast, 151 favored the union, 61 opposed it, and 71 were challenged.[8] Thus, if all the dissenting professionals rejected representation by District 1199, their preferences would be submerged in the union's strong majority among the technical workers.

The State Labor Relations Board certified District 1199 as the bargaining representative of St. Luke's technical and professional employees on June 21. In accordance with its earlier decision, however, professional groups who had filed petitions seeking a separate election were excluded. Thus, District 1199 was not the representative of the dieticians on August 1, 1973, when it concluded a collective bargaining agreement containing the union security and checkoff provisions to which the dieticians would later object.[9]

The dispute lay fallow thereafter until March 22, 1974, when the State Board finally ruled on the dieticians' election petition. Without reaching the question whether the dieticians belonged to a "profession," the Board held that the Professional Dietician Employees of St. Luke's Hospital Center lacked standing to seek a separate election. The "professional proviso" of the New York

sional Dietician Employees, the dieticians could escape collective bargaining altogether.

8. One ballot was void.

9. The 1973 collective bargaining agreement provided for union security and check-off as follows:

ARTICLE II
UNION SECURITY

1. All employees on the active payroll as of the date of execution of this Agreement who are members of the Union shall maintain their membership in the Union in good standing as a condition of continued employment.

2. All Employees on the active payroll as of the date of execution of this Agreement who are not members of the Union shall become members of the Union within thirty (30) days after the effective date of this Agreement, and shall thereafter maintain their membership in the Union in good standing as a condition of continued employment.

3. All Employees hired after the date of execution of this Agreement shall become members of the Union no later than the thirtieth (30th) day following the beginning of such employment and shall thereafter maintain their membership in the Union in good standing as a condition of continued employment.

4. For the purposes of this Article, an Employee shall be considered a member of the Union in good standing if he tenders his periodic dues and initiation fee uniformly required as a condition of membership.

5. Subject to Article XXVIII, an Employee who has failed to maintain membership in good standing as required by this Article, shall, within twenty (20) calendar days following receipt of a written demand from the Union requesting his discharge, be discharged if, during such period, the required dues and initiation fee have not been tendered.

6. The Union agrees that it will indemnify and hold the Hospital harmless from any recovery of damages sustained by reason of any action taken under this Article.

ARTICLE III
CHECK–OFF

1. Upon receipt of a written authorization from an Employee in the form annexed hereto as Exhibit A, the Hospital shall, pursuant to such authorization, deduct from the wages due said Employee each month, starting not earlier than the first pay period following the completion of the Employee's first thirty (30) days of employment, and remit to the Union regular monthly dues and initiation fee, as fixed by the Union. The initiation fee shall be paid in two (2) consecutive monthly installments beginning the month following the completion of the probationary period.

2. Employees who do not sign written authorizations for deductions must adhere to the same payment procedure by making payments directly to the Union.

State Labor Relations Act, § 705(2), said the Board,

> was designed to enable . . . professional employees, if they so desire, to bargain collectively through a specialized representative. It was not intended to be used for negative, exclusionary purposes.
>
> . . .

The group known as the Professional Dietician Employees was founded not to bargain separately on behalf of the dieticians, but rather to avoid collective bargaining altogether. Accordingly, the State Board denied the petitions and ordered its earlier certification of the bargaining unit amended to include the dieticians. The dieticians' ballots were never counted because the challenged votes were insufficient in any event to alter the election result.

District 1199 moved swiftly to include the dieticians in the existing collective bargaining agreement. On June 7, Daniel Ratner, an organizer, proposed an amendment of the 1973 contract to provide a job classification and pay grade for dieticians and to require contributions to the union retroactive to May 1, 1974. On July 19, Richard DeChristoford, the hospital's Assistant Vice President for Personnel, substantially accepted this proposal. The record does not reveal that District 1199 engaged in any bargaining on behalf of the dieticians beyond this exchange of letters. On July 26, 1974, the Hospital and District 1199 entered a new agreement covering the whole bargaining unit. The 1974 agreement does not differ in any respect material to this controversy from the agreement concluded the previous year.[10]

Coincidentally, the July 26 collective bargaining agreement was executed the day President Nixon signed the Non-Profit Hospital Amendments extending the National Labor Relations Act to non-profit hospitals like St. Luke's Hospital Center, the amendments to become effective on August 25, 1974. Under the National Labor Relations Act, a mixed unit of professional and technical workers could not be certified by the NLRB unless a majority of the professionals voted for inclusion. *See* § 9(b)(1), 29 U.S.C. § 159(b)(1). Accordingly, it is clear that the dieticians, had their effort to avoid representation by District 1199 been governed by the national statute, could not have been included in the broad bargaining unit of technical and professional employees without the consent of the majority.

The dieticians remained unreconciled to representation by District 1199 and refused to sign checkoff authorizations and join the union, although the collective bargaining agreement provided that joining the union was a condition of employment. Accordingly, on October 16, 1974, Jesse Olson, the union's executive vice-president, wrote to DeChristoford insisting that the hospital enforce the union security clause against the recalcitrant dieticians. In response to this communication DeChristoford notified the dieticians on October 18 that under the union security clause they were required to become members of the union and that if they did not comply within 20 days their employment would be terminated.

The dieticians responded to this threat one week later by filing unfair labor practice charges against both the hospital and the union. The charges asserted, in effect, that the attempted enforcement of the union security clause violated §§ 8(a)(3) and 8(b)(2) of the national act. This claim was premised on the contention that the bargaining unit was inappropriate because it combined professionals and nonprofessionals without affording the professionals a self-determination election.

Undaunted, District 1199 continued to press the hospital for the dieticians' discharge. It renewed its demand on November 20, stating that it would take the matter to arbitration unless the dieticians were terminated. St. Luke's, evidently concerned about the unfair labor practice

---

10. The 1974 agreement expired in the summer of 1976. We are informed by the union, however, that the parties have concluded a successor agreement purportedly covering the dieti-cians and containing a union security clause in material respects similar to those provided for by the prior contracts.

charges, did not enforce the bargaining agreement, and subsequently District 1199 instituted arbitration proceedings.

The hearing before Arbitrator Morris Glushien proceeded on March 25, 1975. At that time, the union named 16 dieticians— apparently the entire St. Luke contingent [11] —whom it wished the hospital to fire. On the very same day, however, the General Counsel's office in Washington ruled that the dieticians' complaint had sufficient merit to be brought before the NLRB,[12] and, accordingly, a complaint issued on May 8, 1975. In light of this decision, Glushien, though skeptical of the validity of the General Counsel's position, initially refrained from making an award.[13]

On September 3, 1975, Administrative Law Judge Herbert Silberman ruled against the dieticians. In his view, the Non-Profit Hospital Amendments did not invalidate the agreement between St. Luke's and District 1199, and consequently enforcement of the union security clause did not constitute an unfair labor practice. The Board, however, did not agree with Judge Silberman's conclusion. Under the circumstances of this case, in which the dieticians were not accorded a self-determination election and had never acquiesced in representation by District 1199, the Board determined that the enforcement of the union security clause was unlawful and ordered appropriate relief.[14]

## II.

The principal issue before us is how much deference should be paid to collective bargaining arrangements in existence when the Non-Profit Hospital Amendments took effect. The statutory scheme does not speak with Apollonian clarity. Legislation, especially of the complexity of our labor laws, "inevitably overlooks lacunae and ambiguities which the future reveals and which the future must correct." *Ex parte Peru,* 318 U.S. 578, 597, 63 S.Ct. 793, 803, 87 L.Ed. 1014 (1943) (Frankfurter, J., dissenting). Nevertheless, we believe that the accommodation between strongly held national policies and the claims of settled relationships, an accommodation at the heart of any transition from one legislative scheme to another, is best achieved in this case by holding the union security provisions of the collective bargaining agreement unenforceable against the dieticians.

It is undisputed that an employer may not discriminate against an employee for failure to belong to a union, § 8(a)(3), 29 U.S.C. § 158(a)(3), and that a union may not cause or attempt to cause an employer to discriminate, § 8(b)(2), 29 U.S.C. § 158(b)(2), unless union membership is required as a condition of employment by a collective bargaining agreement and the union *"is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made."* The question posed to us may be simply stated: should the language "in the appropriate collective-bargaining unit covered by such agreement when made" be interpreted, despite the enactment of the Non-Profit Hospital Amendments in 1974, to incorporate state certifications which are repugnant to national labor policy and which Congress has expressly forbidden to the NLRB.

The union security proviso of § 8(a)(3), added by the Taft-Hartley Act in 1947, is surely equivocal regarding the standard for judging the appropriateness of a bargaining unit. Of course, the authors of the Taft-

---

11. The union's Exhibit 1 indicates that St. Luke's Hospital employs two clinic dieticians, 13 therapeutic dieticians, and one research dietician, a total of 16.

12. The General Counsel's decision was reported in the BNA Daily Labor Report, March 26, 1975, No. 59, at D 4–5.

13. On October 14, the arbitrator issued an award in the union's favor.

14. The Board ordered St. Luke's Hospital Center to cease and desist from threatening to discharge its dieticians for failure to comply with the union security clause and required the hospital to post a notice informing its employees of the Board's order. District 1199 was similarly ordered to cease and desist its attempts to cause the hospital to discharge the dieticians and to post appropriate notice.

Hartley Act undoubtedly focused their attention on federal standards in deciding to prohibit enforcement of a union security clause against employees improperly included in a bargaining unit when the terms of the contract were agreed upon. We do not have any grounds for believing that Congress would have been satisfied with the application of state standards solely because the National Labor Relations Act was inapplicable when the parties executed their collective bargaining agreement.

■ The mandate of the 1974 amendments is at least equally obscure. Nevertheless, "the general purpose is a more important aid to the meaning that any rule which grammar or formal logic may lay down. . . ." *United States v. Whitridge,* 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696 (1905) (Holmes, J.). In the absence of more express guidance, we believe that Congress would have desired to avoid a serious sacrifice of national policy unless the enforcement of the national standard would unduly upset established relationships.

### A. THE CONFLICT BETWEEN STATE AND FEDERAL POLICIES.

■ Arrangements resulting from state agency proceedings should generally be respected if consistent with federal policies. *See Cornell University,* 183 N.L.R.B. 329, 334 (1970). "Comity" in this sense reflects the desirability of supporting settled relationships in the absence of compelling countervailing reasons. It is clear, however, that the NLRB is not required to defer to state proceedings where federal policy would be undermined. There can be little doubt that an election unfairly conducted, or the certification of a minority bargaining representative, or state support for racial discrimination would deservedly receive scant respect. Our difficulty, however, is in ascertaining the category to which we should assign state certification of a unit commingling professional and technical workers without the consent of a majority of the professionals.[15]

We believe that deference to the state proceedings here would involve a serious sacrifice of national values. As early as 1947 Congress provided:

the Board shall not . . . decide that any unit is appropriate . . . if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit . . . ..

---

15. The legislative history of the Non-Profit Hospital Amendments is not very helpful. The most pertinent passage is the following colloquy between Representatives Quie and Thompson:

Mr. Quie. Suppose the parties had a contract in effect at the date of enactment of the Federal legislation. Would they be allowed to continue under that contract?

Mr. Thompson of New Jersey. Mr. Speaker, if that contract met the requirements of the NLRB, it is our intent that it should be allowed to continue in effect for a reasonable period of time and constitute a "contract bar." However, if it did not meet the NLRB requirements, for instance, if it were signed with a minority union, it allowed for discrimination, or it contained an illegal union security clause, it would be questionable whether that contract would constitute a "bar" if a petition for representation were filed. However, if the contract covered a unit the Board might not find appropriate in the original instance, it seems those contracts should also continue in effect until their expiration date, if for a reasonable period of time, since the parties have agreed to that unit.

120 Cong.Rec. 22942, House of Representatives, July 11, 1974. (Bound edition.)

Of course, this analysis merely restates the fundamental problem. Representative Thompson plainly envisions that a contract will not be upset merely because the Board, in its discretion, might have found a different unit appropriate in the first instance. A contract fundamentally repugnant to national labor policy, however, was not considered similarly sacrosanct. All we can say with assurance is that Representative Thompson envisaged balancing the potential lesion to national policy against the potential chaos caused by upsetting existing bargaining arrangements.

We should note, in addition, that Mr. Quie's question was directed to the possibility of invalidating an entire bargaining agreement. The unfair labor practice charges in this case involve much less disruption of stable labor relationships.

§ 9(b)(1), 29 U.S.C. § 159(b)(1). Animating this provision, as so many others in the Taft-Hartley Act, was the valued concept of employee self-determination. Congress was especially concerned that discrete minorities who did not wish to engage in collective bargaining would not be forced against their will to do so. *See* House Rep. No. 245 on H.R. 3020, I *Legislative History of the Labor-Management Relations Act of 1947,* at 328. This was recognized as a special problem for professionals, who held deeply felt interests in maintaining high standards of scholarship or competence. Congress considered these strong views compelling. Accordingly, the Board was denied discretion to include professionals in mixed bargaining units without the assent of the majority of the professionals. *See Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

We do not mean to suggest that a bargaining unit combining professional and nonprofessional employees is illegal *per se,* even if it has never been approved in an election by a majority of the professionals. The Board has not thought itself prohibited by § 9(b)(1) from recognizing a mixed unit established consensually by the parties rather than by certification, and maintained for many years. *Retail Clerks Union Local 324 (Vicent Drugs No. 3, Inc.),* 144 N.L.R.B. 1247 (1963). Nor is a bargaining unit initially established by the Board in violation of § 9(b)(1) inappropriate forever, despite the professionals' long acquiescence in the collective bargaining arrangement. *See International Telephone & Telegraph Corp. v. N.L.R.B.,* 382 F.2d 366 (3d Cir. 1967), *cert. denied* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968).

These exceptional cases are instructive. In *Vincent Drugs* the professionals had long enjoyed the benefits of collective bargaining in the larger unit. Similarly, in *International Telephone & Telegraph Corp.* professional engineers had joined with technical employees in a consensual bargaining unit before 1951, when the improper election was held, and did not challenge the unit for 13 years thereafter. The long history of collective bargaining in the mixed unit in both cases provided some indication that the self-determination objectives of the Act were satisfied. The case before us, however, is *toto caelo* from those just cited. The dieticians here have from the outset manifested a strong disinclination to be represented by Local 1199.

Obviously, New York policy is fundamentally at odds with the National Labor Relations Act. Section 9(b)(1) was designed not only to permit professional employees to segregate themselves in professional bargaining units, but equally to free them from having to engage in collective bargaining at all unless the majority wished to do so. This choice is precisely what the dieticians desired and what the state board denied them. The policy of professional self-determination which activated § 9(b)(1) is thus frustrated to the degree deference is paid to the state certification.

## B. THE CLAIMS OF ESTABLISHED RELATIONSHIPS.

The respondents strenuously contend that the Non-Profit Hospital Amendments should not be applied "retroactively". We would surely agree that transgressions occurring prior to the effective date of the legislative amendments extending the coverage of the National Labor Relations Act should not be made the basis of an unfair labor practice charge where Congress is silent on retroactive application. But, this is not a case where all the operative facts constituting an unfair labor practice occurred before the Board assumed jurisdiction. *See, e.g., U.S. Postal Service,* 200 N.L.R.B. 413 (1972). The gist of the unfair labor practice charge is St. Luke's attempt, at the union's prodding, to discharge the recalcitrant dieticians for their failure to join the union. The conduct complained of commenced in October, 1974, well after the effective date of the amendments. This case simply does not present a true problem of retroactivity.

Moreover, the doctrine of retroactivity espoused by the respondents appears on

close analysis to require an excessive sacrifice of national policy. Normally the presumption against retroactivity is designed to protect reasonable reliance on prior settled law while permitting the new law full prospective effect. This accommodation is impossible here. District 1199, in effect, is asking for a "grandfather" rule, allowing an arrangement offensive to the principles of the National Labor Relations Act to continue into the future. Nor does the union limit its argument to the period covered by the 1974 collective bargaining agreement. It maintains, rather, that all successor agreements of this bargaining unit—including the most recent one entered into upon the expiration in 1976 of the 1974 agreement—are also protected by the presumption against "retroactivity."

We do not find it necessary to indulge such extravagant claims in this case. Where, as here, there is no tradition of bargaining in a mixed unit and the professionals have vehemently objected to inclusion from the very beginning, we believe the parties' reliance on former law is adequately protected by a rule precluding unfair labor practice charges based upon enforcement of the union security clause prior to the effective date of the amendments. In the circumstances presented to us here, permitting enforcement of the union security clause against the dieticians after the effective date of the 1974 amendments would unnecessarily frustrate the purpose of § 9(b)(1). Accordingly, we will grant the Board's petition.