## Chemical Natural Resources, Inc. v. Republic of Venezuela

*Abraham E. Freedman,* and *Freedman, Borowsky & Lorry,* for plaintiffs.

*Thomas F. Mount,* and *Rawle & Henderson,* for defendant.

MILNER, P. J., and ULLMAN, J., May 13, 1965.— In this action in assumpsit, Chemical Natural Resources, Inc., a Delaware corporation, and its wholly owned subsidiary, Venezuelan Sulphur Corporation, C. A., a corporation of the Republic of Venezuela, as plaintiffs, demand damages of defendant, Republic of Venezuela, in the amount of $116,807,258.28. Defendant, in a special appearance, moved to dismiss for lack

of jurisdiction on the ground, inter alia, that the Republic of Venezuela enjoys the privilege of sovereign immunity. From this court's order overruling the motion to dismiss, with leave to defendant to file an answer within 30 days, defendant has appealed to the Supreme Court. We set forth in this opinion the reasons which moved us to the action which we took.

The material facts alleged in the complaint, which must be taken to be true for purposes of the motion to dismiss, may be briefly summarized. In 1952, for the sum of.$155,000, plaintiffs purchased all mineral rights in an area of Venezuela officially described as Costamora nos. 1, 2, 3, and 4. Their most dramatic discovery in the process of exploiting the territory was a vast reservoir of geothermal steam. Thus, they obtained power with which to operate generators of electricity without the usual expense of boilers and fuel. An agency of defendant entered into a contract with plaintiffs for purchase of the electricity to be generated in this manner. Plaintiffs proceeded with preparations for construction of generating plants at substantial expense. In 1959, defendant "reserved to the nation", or nationalized, the minerals and steam claimed by plaintiffs; however, defendant instructed plaintiffs to proceed with their plans and developments, stating that the nationalization decree was "political window-dressing". A short time later, the ministry that had contracted for purchase of the electricity cancelled the contract, again assuring plaintiffs that this official action was taken for internal political reasons only, and that the agreement would be honored. A further agreement was made in January of 1962, calling for plaintiffs to build the generating plants and operate them for 25 years, sharing equally with defendant the profits from the operation, at the end of which time the power installations and plants would become the sole property of plaintiffs.

In reliance on these assurances, plaintiffs continued to negotiate with defendant in good faith until September 1962, when defendant delivered to plaintiffs a "confiscatory and illegal ultimatum" which was said to be "final" and not subject to discussion or negotiation. Pursuant to this ultimatum, defendant proceeded to expropriate, without compensation, the property rights claimed by plaintiffs.

Plaintiffs commenced this action by attaching a merchant vessel owned and operated by defendant through a nationalized and wholly State-owned company, the vessel being found in the port of Philadelphia. Two days later, plaintiffs' attorney filed a praecipe ordering the attachment dissolved "without prejudice". The only issue presented in argument before this court has been that of defendant's claim of immunity from suit. The validity and regularity of the attachment, and the significance and effect of its dissolution "without prejudice", have not been argued or determined.

On January 13, 1964, Abram Chayes, Esq., Legal Adviser to the Department of State, on behalf of the Secretary of State, wrote to the Attorney General stating that the department "recognizes and allows the sovereign immunity of the Republic of Venezuela, defendant in the above suit, from the jurisdiction of the Court of Common Pleas of Philadelphia County, Pennsylvania", and requested that appropriate instructions be issued to the United States Attorney to file a "suggestion of immunity" with the court. In due course, such a suggestion was filed by Drew J. T. O'Keefe, United States Attorney.

The position of the Legal Adviser to the State Department, the Attorney General, the United States Attorney, and defendant appears to be that immediately on the filing of the suggestion of immunity, this court must automatically dismiss the action, thus clos-

ing the doors of the court to an American corporation, predominantly owned by American citizens, seeking redress against a foreign country alleged to have violated its solemn agreements and to have confiscated private property without compensation. We do not understand the law to require this judicial abdication, and on this record we overruled the motion to dismiss on the ground of sovereign immunity as being at least premature.

"The real justification for the rule of the complete immunity of states from the jurisdiction of a foreign court," says Professor Brierly, ". . . is that, generally speaking, the courts of one State cannot coerce another, nor, for reasons of public policy, is it desirable that they should try": J. L. Brierly, The Law of Nations (3d ed., 1942), page 197. The cases to which our attention has been drawn as implementing this doctrine, and those which our own research has discovered, deal almost exclusively with attachment or detention of vessels or funds of a foreign government, an act generally thought to be inimical to the smooth and orderly conduct of foreign relations by the executive arm of our government. When the factor of seizure and detention of property is absent, as in this case, the reason for application of the doctrine of immunity disappears, since there is no coercion or threat of coercion.

A real distinction exists between judgment and an attempt to enforce execution. The United States, the individual States, and their subdivisions historically have enjoyed immunity from suit, but that immunity has given way in large measure in the last 100 years. Yet all of them are still protected from execution. In respect even of the seizure and detention of the property of foreign nations, the United States has publicly announced that it will not request immunity for foreign nations where nongovernmental activities are in-

volved; and the United States has adopted the policy of not claiming immunity for its own property when engaged in nongovernmental activity. We can see no valid reason for according to foreign governments a privilege not requested by or accorded to our own.

Congress has, in the Foreign Assistance Act of October 7, 1964, clearly announced a policy of protecting American citizens against acts of foreign nations in violation of international law, and has further directed the courts of this country not to recognize a claim of immunity by way of the act of State defense on the part of a foreign nation unless the President himself, in the particular case, suggests that such immunity is required by the foreign policy interests of the United States.

To quote again from Professor Brierly (page 195) :

"This reliance on a statement by the executive is tolerable only on the assumption that in informing the court a government department discharges the function which the law entrusts to it with candour and fairness to the parties concerned, as indeed it generally does".

The suggestion filed in this case does not disclose the State Department's reasons for having arrived at its conclusion. Indeed, it does no more than recite that defendant is a foreign friendly nation, and that it should therefore be immune from suit. This appears to us to be inconsistent with that department's announced policy in the past and with the department's statement, in connection with this case, that the decision was made in the light of legal issues. It is our view that legal issues are not within the competence of the executive arm of the government, but should be determined in the regular course of litigation by the judicial arm. We have not yet determined, and cannot determine, these issues on the record before us. All we have done is to refuse to abdicate our judicial func-

tion until we can be further enlightened respecting the nature of the activities giving rise to this litigation and the circumstances of the alleged breach of contract of which plaintiffs complain.

It is now necessary that we set forth at some length the authorities which we have consulted and the reasoning which we have followed in arriving at our conclusion.

We turn first to the decisions of our own Supreme Court, the most nearly apposite of which is F. W. Stone Engineering Company v. Petroleos Mexicanos, 352 Pa. 12 (1945). There, an Ohio corporation sued a corporate governmental instrumentality of the Republic of Mexico, attaching funds of defendant on deposit in a local bank. At the request of the Secretary of State, the Attorney General directed the United States Attorney to file a suggestion of immunity. The communication from the secretary recited that the State Department accepted as true the statements made by Mexico's diplomatic representatives to the effect that defendant corporation was a public agency or instrumentality of the Republic of Mexico, and added: "Consequently, this Government recognizes and allows the claim of the Government of Mexico that Petroleos Mexicanos is immune from suit and *its property from attachment*": 352 Pa. at page 15. (Italics supplied.)

On the faith of this suggestion, the court of common pleas dissolved the writ of attachment. On appeal, the question was, as stated by the Supreme Court ". . . whether the State Department's recognition of the defendant corporation as a governmental instrumentality of the Republic of Mexico, with an attendant right to sovereign immunity, required the court below *to release property of the defendant from the grasp of the court's process, viz., a writ of foreign attachment issued by the plaintiff against funds of the defendant on deposit in a local bank*": Id. page 13. (Italics supplied.)

It is at once apparent that there are two differences between the Stone case and this. First, the prime function of the State Department's suggestion of immunity in the Stone case was to establish that defendant corporation was indeed a governmental instrumentality; but that difference is hardly material, since, here, defendant is the Republic of Venezuela itself, so that if the doctrine of sovereign immunity is properly invoked, there can be no doubt that this defendant is the party entitled to invoke it. The second difference is, we think, material. Although both Stone and this case were commenced by writ of foreign attachment, the primary question in Stone was whether the court was required by executive policy to release property of the foreign government seized pursuant to judicial process, while, here, the attachment was dissolved and the property released two days later. Hence, we do not have before us the question presented to and decided by the Supreme Court in Stone, which was whether a court must release attached property of a foreign government on the State Department's suggestion of sovereign immunity. It seems clear to us that the seizure of a vessel owned and operated by a foreign government, or of its funds on deposit in a local bank, raises policy considerations of a different order from those raised by an action in which there is no detention of property, but only a prayer for a judgment, ultimately to be enforced or satisfied, if at all, in a manner not disclosed to us by this record.[1]

In its opinion in the Stone case, the Supreme Court used broad language concerning the prerogatives of the Executive Department with reference to the defense of sovereign immunity asserted by foreign na-

---

[1] At a later point in this opinion we shall take judicial notice of a circumstance that may indicate that such a judgment, if obtained, may not be valueless. See the discussion below of the Foreign Assistance Act of October 7, 1964, 78 Stat. 1009, 22 U. S. C. sec. 2370.

tions in our courts. It cited with approval the decision of the United States Supreme Court in Ex parte Republic of Peru, 318 U. S. 578 (1943), then just two years old. That case also involved seizure of the property of a foreign government. Specifically, the proceeding was a libel in rem in admiralty against a steamship owned by the Peruvian government. (If foreign attachment is a drastic creditors' remedy, and it is, the arrest of a vessel in an admiralty proceeding in rem is perhaps more so.) Release of the vessel was procured only by the filing of a surety bond in the amount of $60,000, in accordance with usual admiralty procedures. The Republic of Peru was the principal obligor on this bond. By contrast, we observe that in the proceeding before us the vessel was immediately released by order of plaintiff's attorney without any such inconvenience or expense to the defendant government.

In the Peru case, the foreign government followed the same course as that pursued by the present defendant, applying to the State Department for a letter to the Attorney General, who, in turn, instructed the United States Attorney to file a suggestion of immunity. The statement of the United States Attorney prayed specifically that ". . . *the said vessel* proceeded against herein be declared immune from the jurisdiction and process of this court": 318 U. S., at page 581. (Italics supplied.)

We read the Peru decision as limited to cases involving seizure and detention of the property of a foreign sovereign, and hence as not controlling in the case before us. To illustrate the importance of the factor of detention, we quote portions of the opinion of the court, written by Mr. Chief Justice Stone:

"This case presents no question of the jurisdiction of the district court over the person of a defendant. . . . Here the district court acquired jurisdiction in

rem by the *seizure and control of the vessel* . . . There-
fore, the question which we must decide is not whether
there was jurisdiction in the district court acquired
by the appearance of petitioner, but whether the juris-
diction which the court had already acquired by *seizure
of the vessel* should have been relinquished in con-
formity to *an overriding principle* of substantive law.

"That principle is that courts may not so exercise
their jurisdiction, by the *seizure and detention of the
property* of a foreign sovereign, as to embarrass the
executive arm of the Government in conducting for-
eign relations . . . More specifically, the *judicial
seizure of the vessel* of a friendly foreign state is *so
serious a challenge* to its dignity, and may so affect
our friendly relations with it, that courts are required
to accept and follow the executive determination that
*the vessel* is immune. *When such a seizure occurs* the
friendly foreign sovereign may present its claim of
immunity by appearance in the suit and by way of
defense to the libel . . . But it may also present its
claim to the Department of State . . . Upon recog-
nition and allowance of the claim by the State Depart-
ment and certification of its action presented to the
court by the Attorney General, it is the court's duty
*to surrender the vessel* and remit the libelant to the
relief obtainable through diplomatic negotiations. . . ."
" . . .

"The certification and the request *that the vessel be
declared immune* must be accepted by the courts as a
conclusive determination by the political arm of the
Government *that the continued retention of the vessel*
interferes with the proper conduct of our foreign re-
lations. Upon the submission of this certification to
the district court, it became the court's duty, in con-
formity to established principles, *to release the vessel*
and to proceed no further in the case": 318 U. S. 587-
89. (Italics supplied.)

Hence, we find nothing in the Peru case requiring this court to relinquish jurisdiction of this action, since no property of the defendant sovereign is detained pursuant to the process of this court. The distinction between actions involving seizure and detention of government property and actions not involving such seizure and detention is both substantial and familiar. In 1916, Congress created the United States Shipping Board by an act which was construed by the Supreme Court as subjecting Government-owned merchant vessels to arrest and attachment on the same basis as private vessels. See The Lake Monroe, 250 U. S. 246 (1919). The Court of Appeals for the Second Circuit, in a masterpiece of understatement, summarized the consequences as follows:

"The arrest and seizure of government-owned merchant vessels was regarded as detrimental to the public interest": The Isonomia, 285 Fed. 516, 519 (2d Cir., 1922).

Elsewhere it has been commented that had Congress wished to insure our loss of the war, it could hardly have chosen a more effective measure than to subject our publicly owned merchant vessels to the harassment of seizure under judicial process. Fortunately, the outcome was not so disastrous as it threatened to be. But Congress, in due course, corrected its error in 1920 with the passage of the Suits in Admiralty Act, 41 Stat. 525, 46 U. S. C. §§741-52. The first section of the act provided, significantly, that "No vessel owned by the United States . . ." or its instrumentalities, and no government cargo, should, *"in view of the provision herein made for a libel in personam,* be subject to *arrest or seizure* by judicial process. . . ." Then, in the second section of the act, Congress consented to libels in personam against the United States and its maritime instrumentalities. (Italics supplied.)

Against this historical background, the meaning of

Ex parte Peru seems unmistakable: especially in time of war, seizure of the vessels or other property of a government is a very serious matter indeed; and the Justices of the Supreme Court, deciding the Peru case in 1943, doubtless had clearly in mind the difficulties suffered by our own government during the First World War,[2] when Congress had permitted such

[2] The brief for the Republic of Peru, p. 20, argued:

"The question of American foreign policy under war conditions, particularly as concerns all but two South American republics, is one of the greatest moment. Under present circumstances, even more than in normal times, those relations should, as was said by Learned Hand, C.J., in Sullivan v. State of Sao Paulo, supra, page 11, be left for determination to the Executive and not to the Judicial departments and those circumstances justify the request of the Republic of Peru that the questions submitted to this Court now shall be fully determined and the error into which the District Court has fallen corrected." Further, it was argued (id.pp.20-21): "The second and more potent principle is that in our Government of divided powers, the courts yield to the Executive in matters involving our friendly relations with foreign nations. When present world conditions are considered, this latter principle cannot be thought either unwholesome or unimportant."

The libel in Ex parte Peru was filed against the vessel for its failure to carry a cargo of sugar from a Peruvian port to New York, as required by the terms of a charter party: 318 U. S. 578, at page 580. The reason for the failure was the diversion of the ship from New York to New Orleans because of the "submarine menace". Petition for a writ of mandamus and/or a writ of prohibition, page 47 (filed in Supreme Court by Republic of Peru). At the time of its arrest, the vessel was "under engagement to transport materials for the United States Army and thereafter she will be, as heretofore, engaged in the transportation of merchandise produced in the Republic of Peru to the United States or to other friendly countries": Id., pages 47-8. More specifically, Under Secretary of State Welles wrote to the Attorney General, May 5, 1942: "With reference to the statement in the Ambassador's note that the *Ucayali* is under contract to transport materials for the United States Army, this Department has been informed by an official of the Water Transport Service, War Department, that the vessel now has on board a cargo to be carried to Panama for the War Department": Id., page 45.

seizure. But while detention of American vessels has been prohibited since 1920, and detention of foreign vessels to some extent since 1943, there has at no time since 1916, at least, been any objection to a suit against the United States in admiralty not involving detention; nor do we believe that there is or has been any law to the effect that foreign governments are in this respect to be given more favorable treatment than our own.

A comparable distinction was drawn a good many years earlier in Workman v. New York City, 179 U.S. 552 (1900), holding that the quasi-sovereign immunity of a municipality in the exercise of its governmental functions was no defense to a suit in admiralty for damage caused by a municipal fireboat, although the judgment could not be enforced by levy on property held for public purposes, and although public policy forbids a preliminary seizure of such property. This distinction between jurisdiction of an action against a public body and execution incident to such an action has been widely recognized. As stated by the Legal Adviser to the Department of State in a letter to the Attorney General in the case of Weilamann v. Chase Manhattan Bank, 21 N. Y. Misc. 2d 1086, 192 N. Y. S. 2d 469 (Sup. Ct., 1959):

"The Department has always recognized the distinction between 'immunity from jurisdiction' and 'immunity from execution.' The Department has maintained the view that under international law property of a foreign sovereign is immune from execution to satisfy even a judgment obtained in an action against a foreign sovereign where there is no immunity from suit . . . The Department is of the further view that even when the attachment of the property of a foreign sovereign is not prohibited for the purpose of jurisdiction, nevertheless the property so attached and levied upon cannot be retained to satisfy a judgment ensuing

from the suit because, in the Department's view, under international law the property of a foreign sovereign is immune from execution even in a case where the foreign sovereign is not immune from suit."

The text of this letter is set forth in 54 Am. J. Int. Law 643 (1960). We note a local analogy in our own Pennsylvania Rules of Civil Procedure 3101(a), which, according with existing case law, exempts from the processes of execution judgments obtained against the Commonwealth, a political subdivision or a public authority.

We believe that the foregoing discussion effectively disposes of the contention that precedents such as Ex parte Peru require this court to abdicate its judicial function in this case, since those precedents deal solely with detention of property and not with jurisdiction to enter judgment where no property has been attached.

We may add, however, that, even so limited, the concept of the executive prerogative in cases of claimed sovereign immunity is, to say the least, in process of erosion. We quote the following from the American Law Institute's Restatement of the Law, the Foreign Relations Law of the United States, 249-250 (Proposed Official Draft 1962):

". . . a decision as to whether a suit should be dismissed because of the immunity of a foreign government from suit involves a variety of questions. Some of these questions are clearly questions which are within the exclusive competence of the Department of State, such as whether the government is recognized, whether the ambassador is accredited and whether the foreign political entity is one with which the United States conducts diplomatic relations. . . .

"Some of these questions are clearly outside the special competence of the Department of State . . .

"Despite the broad language in The Navemar, Ex

parte Peru, and Republic of Mexico v. Hoffman, it is believed that the Supreme Court will not follow literally the statement that if a claim of sovereign immunity by a foreign government 'is recognized and allowed by the executive branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion.' It is believed that the Court meant such a statement to be applicable, literally, only to those questions which it considered to be within the exclusive competence of the executive branch of the Government".

This is substantially the view taken as early as 1946 by the distinguished international jurist, Philip C. Jessup, who was among those who severely criticized even the limited doctrine of executive prerogative announced by the Supreme Court in such cases as Ex parte Peru. See Jessup: "Has the Supreme Court Abdicated One of Its Functions?" 40 Am. J. Int'l L. 168 (1946). Recognizing that certain political questions involved in claims of sovereign immunity must be reserved to the State Department, Professor Jessup criticized the tendency of the Supreme Court to hold that in cases of seizure, the function of determining the basic legal principle governing the immunity should be surrendered to the executive: "From the international point of view, this is a most unsatisfactory role for the Department of State to discharge. It is not organized in such a way as to facilitate its rendering what are essentially judicial decisions. . . . It is the normal process of international affairs to insist that a question of this character must be submitted to the courts and that the diplomatic channel should be utilized only where the courts fail to do justice": Id. page 169.

"Far from contributing to the smooth functioning of our foreign policy, the present position of the Supreme Court . . . may prove to be seriously detrimental": Id. page 170.

This doctrine of sovereign immunity is an ancient one. To have had validity at all, it must have inhered in the concept of sovereignty itself, a concept which has undergone marked change in recent history. As applied to the local government, it was bottomed on the idea that "the king can do no wrong", that the act of the sovereign himself made the law. As applied to a foreign power, it was regarded as inconsistent with the sovereign's dignity to permit his acts to be brought in question before a foreign judicial tribunal. In both instances, the doctrine has waned. Both stemmed from the anthropomorphic concept of sovereignty as embodied in a single monarch whose majesty derived from divine right. Both have given way, with the rise of constitutional government on the one hand, and, on the other, the prevalence of governments' engaging in commercial and proprietary undertakings and their growing subjection to the law of nations. This erosion of the strict doctrine of sovereign immunity is a healthy and welcome development, for without it international law would still be, as A. Edward Newton once humorously characterized it, "a device made of sand, painted to look like iron, but which invariably falls to pieces when subjected to the use for which it is designed".[3]

The salutary process of erosion to which we have referred is attested by the decision in National City Bank of New York v. Republic of China, 348 U. S. 356 (1955), where it was held that a foreign sovereign resorting to our courts subjects itself to counterclaims unrelated to the sovereign's claim. Mr. Justice Frankfurter said, in the opinion of the court:

"But even the immunity enjoyed by the United States as territorial sovereign is a legal doctrine which has not been favored by the test of time. It has increasingly been found to be in conflict with the growing sub-

---

[3] Newton on Blackstone, U. of P. Press, 1937, p. 8.

jection of governmental action to the moral judgment. A reflection of this steady shift in attitude toward the American sovereign's immunity is found in such observations in unanimous opinions of this court as 'Public opinion as to the peculiar rights and preferences due to the sovereign has changed,' . . . 'There is no doubt an intermittent tendency on the part of governments to be a little less grasping than they have been in the past . . .,' 'the present climate of opinion . . . has brought governmental immunity from suit into disfavor : . .' This chilly feeling against sovereign immunity began to reflect itself in Federal legislation in 1797. At that early day, Congress decided that when the United States sues an individual, the individual can set off all debts properly due him from the sovereign. And because of the objections to ad hoc legislative allowance of private claims, Congress a hundred years ago created the Court of Claims, where the United States, like any other obligor may affirmatively be held to its undertakings. This amenability to suit has become a commonplace in regard to the various agencies which carry out 'the enlarged scope of government in economic affairs . . .' The substantive sweep of amenability to judicial process has likewise grown apace".

Mr. Justice Frankfurter's reference to early relaxations of the doctrine of sovereign immunity by the United States prompts us to sketch the subsequent history of that development. In 1877, Congress passed the Tucker Act, 24 Stat. 505, 28 U. S. C. A. §1346 (a), giving the district courts concurrent jurisdiction with the Court of Claims of suits against the United States sounding in contract. By a series of acts, notably the Federal Employees' Compensation Act of September 7, 1916, 39 Stat. 742, 5 U. S. C. A. §751, et seq., the United States made itself liable to pay workmen's compensation to its employes. We have already mentioned

the Suits in Admiralty Act of March 9, 1920, 41 Stat. 525, 46 U. S. C. A. §741 et seq., which was followed on March 3, 1925 by a similar act applicable to government vessels other than merchant vessels; that is, to actual ships of war: 43 Stat. 1112, 46 U. S. C. A. §781, et seq. Other miscellaneous acts consenting that the United States be sued might be cited, but we conclude this brief enumeration with a reference to what is perhaps the most dramatic inroad on the doctrine of sovereign immunity so far as the Government of the United States is concerned, the Federal Tort Claims Act of August 2, 1946, 60 Stat. 843, 28 U. S. C. A. §1346(b).

The Constitution of Pennsylvania provides, in article I, sec. 11:

"Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct".

Pursuant to this provision, the Legislature in 1937 created a Board of Arbitration of Claims against the State, with jurisdiction to arbitrate claims against the Commonwealth arising from contract: 72 PS §4651-1, et seq. Throughout the country, courts are progressively abrogating the defense of sovereign immunity as asserted by the States and their political subdivisions. See, e.g., Molitor v. Kaneland Community District, 18 Ill. 2d 11, 163 N. E. 2d 89 (1959): Hargrove v. Town of Cocoa Beach, 96 S. 2d 130 (Fla., 1957); Williams v. City of Detroit, 364 Mich. 231, 111 N. W. 2d 1 (1961); Muskopf v. Corning Hospital District, 55 Cal. 2d 211, 359 P. 2d 457 (1961); Colorado Racing Comm. v. Brush Racing Assn, 136 Colo. 279, 316 P. 2d 582 (1957). Note also Mr. Justice Cohen's critical comment on the doctrine of sovereign immunity as applied to a political subdivision of the commonwealth: Morris v. Mount Lebanon Township School District, 393 Pa. 633 (1958).

In other States, such as North Carolina (Gen. Stats. secs. 143-291, et seq.) and New York (McKinney's Consol. Laws Ann., Book 29A, Court of Claims Act), the immunity of the State has been abolished by statute or a claims act has been established to provide for and regulate the liability of the State.

In the light of such developments, defendant's insistence on complete immunity for a *foreign* sovereign, in matters not only of tort but also of contract, upon the mere fiat of an officer of the executive department, without judicial determination of the merits even of that defense, is, to say the least, incongruous.[4]

We come now to a significant development that occurred subsequent to the line of decisions exemplified by Ex parte Peru, the cases most favorable to the defense of sovereign immunity upon the suggestion of the State Department. This is the well-known "Tate Letter", a communication dated May 19, 1952, from Jack B. Tate, Acting Legal Adviser to the Department of State, to the Attorney General. See 26 Dept. of State Bull. 984 (1952); reprinted in American Law Institute Restatement of the Law, the Foreign Relations Law of the United States, 235-38 (Proposed Official Draft, 1962). The letter stated that the department had for some time had under consideration a change of policy respecting the circumstances in which im-

---

[4] Further on the degeneration of the defense of sovereign immunity, see Victory Transport, Incorporated v. Comisaria General, 336 F. 2d 354 (2d Cir., 1964); Harris & Co. Advertising, Inc. v. Republic of Cuba, 127 S. 2d 687 (Fla., 1961); Setzer, "The Immunities of the State and Government Economic Activities", 24 Law. & Contemp. Prob. 291, at 387 et seq., and sources cited therein at footnote 74 (1959); Cardozo, B. N., "Sovereign Immunity: The Plaintiff Deserves a Day in Court", 67 Harv. L. Rev. 608 (1954); Garcia-Mora, "The Doctrine of Sovereign Immunity of Foreign States and Its Recent Modifications", 42 U. Va. L. Rev. 335 (1956).

munity would be claimed for foreign sovereigns. It reviewed the two theories of sovereign immunity, the classical, or absolute, concept and the restrictive concept, noting that, while the United States had, in general, adhered to the absolute concept, changes in the attitudes of other nations, and in particular the emergence of the trading State, required a change of policy. It noted that the United States "some years ago announced, and has since followed, a policy of not claiming immunity for its public owned or operated merchant vessels". It continued:

"The reasons which obviously motivate state trading countries in adhering to the [absolute] theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is *most inconsistent* with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that *the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons dealing with them to have their rights determined in the courts.* For these reasons it will be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity".[5] (Italics supplied.)

---

[5] "As indicated in the letter of the Acting Legal Adviser, the national courts of most states do not extend immunity to the commercial activities of foreign states. A denial of sovereign immunity in such a case would not be a violation of the rights of the foreign state under international law. In placing the reliance that it did upon the views of the executive branch of the government

American citizens and corporate enterprises dealing with a foreign sovereign and its commercial instrumentalities in essentially commercial ventures were entitled, it seems to us, to rely on this published official assurance that they would not be denied their day in court if the foreign sovereign should fail to carry out agreements negotiated in good faith. On the record before us, it is not absolutely clear that the joint venture, if we may so describe it, into which plaintiffs entered with the Republic of Venezuela and its corporate instrumentalities, is to be characterized as a commercial enterprise within the meaning of the restrictive doctrine of sovereign immunity. Although we are aware that exploitation of the natural resources of a nation is a matter of important national policy, we are inclined to the view that the negotiations and agreements recited in the complaint, for development by plaintiffs of mineral resources and utilization of the geothermal steam for generation of electric power, were distinctly commercial in character. At the very least, we should not dismiss this action without evidence and argument sufficient to satisfy us that this is not true. Hence, the defense of sovereign immunity, if not clearly untenable, is at least prematurely asserted. As this record stands, our clearest conviction is that the State Department's suggestion that immunity be granted in this case is flatly inconsistent with the policy announced in the Tate Letter, and, if

---

in Ex parte Peru and Republic of Mexico v. Hoffman, the Supreme Court appears to have been influenced in decision by a concern that it should not subject the United States to a claim that, in a matter of the immunity of a foreign state, it had violated the rights of another state under international law. Since international law does not require immunity in such a case, and since this has now been recognized by the executive branch, it is anticipated that the rule stated in this Section will be followed in the courts of the

followed by this court without further consideration, would deprive plaintiffs of the right of access to the courts thereby assured to them.

We are strengthened in this conviction by the able discussion of "Sovereign Immunity, State Trading, Socialism and Self-Deception", by Sigmund Timberg, Esq., in 56 Nw. U. L. Rev. 109 (1961), criticising the failure of the State Department to implement the promises of the Tate Letter. Mr. Timberg aptly describes what defendant asks this court to do in response to the State Department's suggestion of immunity, inconsistent though that suggestion seems to be with the policy announced in the Tate Letter:

"Upon receipt of this modestly titled document, delicately presented to the court not by a State Department official but by the local United States Attorney, the court is expected gratefully to acquiesce, discharged of its awesome responsibility for deciding something that might somehow upset this country's foreign relations": Id. page 114.

Mr. Timberg goes on to point out that judicial deference to the State Department's suggestion may have some validity when what is involved is a possible interference with the conduct of this country's foreign relations, but that when what is involved is the doctrine of "relative", or restrictive, sovereign immunity announced in the Tate Letter, this element of validity vanishes, "for that doctrine calls for the essentially judicial process of applying a legal rule to a given state of facts, resulting in an *international law* decision, and is not governed by *foreign relations* considerations": Id. page 115; emphasis in the original.

In this connection, we are constrained to note a rather remarkable feature of the State Department's

United States": American Law Institute, Restatement of the Law, the Foreign Relations Law of the United States, 238 (Proposed Official Draft, 1962).

action in the instant case. Under date of February 7, 1964, Abram Chayes, Esq., the Legal Adviser who had requested that the Attorney General cause the suggestion of sovereign immunity to be made to this court, wrote to Mr. Benjamin S. Dowd, president of one of plaintiffs, a letter containing the following statement:

"The decision of the Department of State in this matter was made in the light of *legal issues* developed in the written memoranda and oral arguments presented by the attorneys for your corporation and the attorneys for the Government of Venezuela". (Italics supplied.)

In commenting on this statement, we repeat that we speak on the basis of an inadequate record, because the defense of sovereign immunity has been, as we view it, prematurely pressed. We cannot be certain, therefore, what the statement means. The precise legal issues thought by the department to be decisive are totally unspecified. It is not possible to tell whether the determination of those issues was within the department's exclusive competence or not, or, indeed, whether any of the legal issues in the light of which the decision was made were, in fact, the basis for the department's decision. We do not believe that the Department of State can oust a court from its jurisdiction to decide legal questions properly within the court's competence by filing a suggestion of immunity which does not disclose that the department has made a determination within its exclusive competence. Were the rule otherwise, the executive, despite our system of separation of powers, could oust a court from jurisdiction for any reason, whether or not the reason related to a matter within the executive's exclusive competence, or indeed, as in the instant case, without announcing any reason at all. By contrast, and by way of

distinguishing the holding in Rich v. Naviera Vacuba, S.A., 295 F. 2d 24 (4th Cir., 1961), in which the court gave effect to the suggestion of immunity, we note that the opinion of the district court reveals that the basis for the filing of the suggestion was that it was, in effect, required by the foreign policy interests of the United States; and at 197 F. Supp. 710, at page 714, the Secretary of State is quoted as having written to the Attorney General: ". . . this is to inform you that it has been determined that the release of this vessel would avoid further disturbance to our international relations in the premises".

Standing unexplained as it does in this record, the Legal Adviser's statement that the decision to issue the suggestion of immunity was made in the light of legal issues appears to us to be totally inconsistent with any contention that the department's action in recognizing and allowing the defense of sovereign immunity has anything to do with the implementation of foreign policy and the conduct of foreign relations. It appears to mean, rather, that the State Department, or one or more of its agencies, arrogated to itself the responsibility of holding a hearing, listening to oral arguments and considering written memoranda presented by counsel for both sides, and then made a determination of the "legal issues" involved. This we regard as an exercise of the judicial, not the executive, function. If we are mistaken, we can be corrected by such enlightenment as defendant and the State Department can provide in further proceedings in this cause after an answer has been filed.

If indeed the issue before us concerns national policy relative to the conduct of foreign relations, and the effect thereon of judicial action, we find a helpful and very significant analogy in the Foreign Assistance Act of October 7, 1964, 78 Stat. 1009, 22 U. S. C. A. §2370, relevant portions of which we quote, as codified:

"(e) (1) The President shall suspend assistance [6] to the government of any country to which assistance is provided under this chapter or any other act when the government of such country or any government agency or subdivision within such country on or after January 1, 1962—

"(A) has nationalized or expropriated or seized ownership or control of property owned by any United States citizen or by any corporation, partnership, or association not less than 50 per centum beneficially owned by United States citizens, or

"(B) has taken steps to repudiate or nullify existing contracts or agreements with any United States citizen or any corporation, partnership, or association not less than 50 per centum beneficially owned by United States citizens, or

"(C) has imposed or enforced discriminatory taxes or other exactions, or restrictive maintenance or operational conditions, or has taken other actions, which have the effect of nationalizing, expropriating, or otherwise seizing ownership or control of property so owned . . .

"(2) Notwithstanding any other provision of law, no court in the United States shall decline, on the ground of the Federal act of state doctrine, to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the

---

[6] We think it is appropriate to take judicial notice of the fact that from 1956 through 1964, the United States has granted aid to the Republic of Venezuela in an aggregate amount of upwards of $380,000,000.

other standards set out in this subsection: *Provided,* That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law, or with respect to a claim of title or other right acquired pursuant to an irrevocable letter of credit of not more than 180 days duration, issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court, or (3) in any case in which the proceedings are commenced after January 1, 1966".

Subparagraph 1 rather plainly declares a strong national policy for protection of the rights of American citizens and enterprises whose property has been expropriated, or whose contracts have been repudiated by foreign governments. We observe that not less than 50 percent of plaintiff, Chemical Natural Resources, Inc., is beneficially owned by United States citizens, and that the confiscatory ultimatum and contract repudiation are alleged to have occurred in September 1962, bringing this case within the terms of the subparagraph.

Before we speak of subparagraph 2, we must emphasize that we are not in the instant case directly concerned with the act of State doctrine, though the relation of that doctrine to the doctrine of sovereign immunity will be at once discernible. It may be that defendant will seek to rely on the act of State doctrine at a later stage of the litigation. Here, we are confronted with the threshold contention that defendant is immune from suit. Only if it can be sued can it logically defend by invoking the act of State doctrine.

Nonetheless, we think it is significant that Congress has, with certain exceptions, abrogated a doctrine that has hitherto served to shield from judicial redress the arbitrary confiscation of private property contrary to the principles of international law. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U. S. 398 (1964).

In the light of this action by Congress, we cannot believe that this court is obliged, or even at liberty, to close its doors to an American corporation complaining of such confiscation. Emphatically we do not believe that we should close the doors of this court to these plaintiffs at the "suggestion" of the Legal Adviser to the Department of State, even though he acted, at least nominally, on behalf of the secretary, the suggestion giving no reason for the department's action but being accompanied by a communication from the United States Attorney reciting generalities concerning "the implementation of . . . foreign policy and . . . the conduct of . . . international relations", when the comparable and closely related national policy tolerating the act of State doctrine has been limited, inter alia, to cases "with respect to which the President determines that application of the act of state doctrine is required *in the particular case* by the foreign policy interests of the United States and a suggestion to this effect is filed *on his behalf* in that case with the court".

In other words, this court could be precluded from entertaining a defense based on the act of State doctrine, in this case only by a specific determination by the President that application of the doctrine is required in this *particular case* by the foreign policy interests of the United States, and with a suggestion to that effect filed in this court on behalf of the President.

This being the policy enacted by Congress with respect to the act of State doctrine, we are not disposed

to dismiss this action merely on the basis of a rather perfunctory suggestion by the Legal Adviser to the State Department, phrased in general terms, that defendant is immune from suit in the first place.